CHANEY, J.,
Concurring.—I concur with the opinion in order to express an individual view on two issues.
First, even if substantial use of a fire road could ripen into public dedication of the servient tenement, no substantial evidence supports the trial court’s finding that the “Hastain Fire Road” experienced such use.
*1039 ‘“[W]here an intent to dedicate is implied as a legal fiction from the nature of public usage, the caselaw requires a high standard of usage, lest private property rights be too easily diminished.” (Hanshaw v. Long Valley Road Assn. (2004) 116 Cal.App.4th 471, 482 [11 Cal.Rptr.3d 357].) ‘“The use must be substantial, diverse, and sufficient, considering all the circumstances, to convey to the owner notice that the public is using the passage as if it had a right so to do.” (Friends of the Trails v. Blasius (2000) 78 Cal.App.4th 810, 826, fn. 7 [93 Cal.Rptr.2d 193].) Factors to consider include the nature of the property, its physical condition, the owner’s knowledge (actual or imputed) of public use of the property, and the frequency and nature of the use. (See, e.g., Union Transp. Co. v. Sacramento County (1954) 42 Cal.2d 235, 241 [267 P.2d 10] [‘“general appearance, location and evident purpose of’ property, the nature of the public’s use of it, and the owners’ knowledge of the use are considered when determining whether dedication occurred].)
Here, the only legacy hiker to have used the ‘“Hastain Trail” every pertinent year was Goller, beginning when he was 10 years old, who used the trails only on Sundays. Harrow used the trail during only four of the five prescriptive years, having been away at college in 1969. Carl used the trail only after October 1968, and never hiked during the summer months. Harris and Hemingway hiked only six months, in the summers of 1970 and 1971. And Foran and Saul used the trail eight times between them in 1971. Thus for 21 months of the prescriptive period, from March 1967 to September 1968 and from January to March 1972, only Goller and Harrow used the Hastain Trail, and only on weekends. Carl began hiking the trail in October 1968, using it between zero and eight days per month for seven months out of the year. In 1969, Harrow went off to college, leaving Goller as the only hiker (and only on Sundays) from May to September 1969, joined by Carl during the other seven months. In 1970, Harrow returned, and Harris and Hemmingway began hiking in the summer, when Carl was absent. In 1971, with the addition of Foran and Saul, all seven legacy hikers used the trails.
I recognize the real issue is not how much the legacy hikers used the trail but how much usage may fairly be inferred from their observations while using it. (E.g., Burch v. Gombos (2000) 82 Cal.App.4th 352, 357 [98 Cal.Rptr.2d 119] [three legacy users testified about other users].) Here, Goller testified he observed eight to 20 people over the course of each of his hikes, and Harrow saw between two and 12 people each day he was on the trail. Carl’s experience was similar, as she occasionally saw groups of two to four on the trail. And this roughly matches the experiences of Harris and Hemingway, who saw between six and 20 people during their hikes, and to a lesser extent Foran, who would see one or two others. (Saul saw no one else.)
These observations support the trial court’s finding that the legacy hikers saw an average of ‘“about three to four other hikers” on the Hastain Trail.
*1040 When it extrapolated the legacy hikers’ experience “over the hours of the day and days of the year” to conclude that “thousands”[1] of hikers used the Hastain Trail during the prescriptive period, the court drew at least two reasonable inferences from the legacy hikers’ observations. First, the court reasonably inferred use of the trail was basically uniform over the hiking hours of any given day. Because the legacy hikers testified to using the trail for one or two hours per trip and to seeing other hikers each trip,[2] it is reasonable to infer that others used the trail at other times on those days. The alternative hypothesis—that on every trip those encountered on the trail were the trail’s only other users that day—would be highly unlikely. In a similar vein, it was also reasonable, with an exception we will discuss below, for the court to assume that usage was basically uniform from one day to the next. Legacy hikers used the Hastain Trail approximately one day out of three. That other users were encountered on each trip suggests even more hikers were there on days no legacy hiker went. Again, the alternative hypothesis, that visitors used the trail only on the days they were encountered by legacy hikers, is unlikely.
But the court could not reasonably infer from the legacy hikers’ observations that the Hastain Trail saw substantial weekday use throughout the year, because for 54 out of 60 prescriptive months there is no evidence any legacy hiker used the trail on any weekday. Goller and Harrow used it only on weekends, and neither Carl, Foran nor Saul specified which days they hiked. Even taking into account the experience of Harris and Hemingway, the summer weekday hikers, there would still be no reason to infer several individuals used the trail on any nonsummer weekday. The alternative hypothesis, that the trail was not much used during weekdays in the nonsum-mer months, is reasonable, because days are shorter and people have jobs and school.
True, plaintiffs were not required to prove the public used the Hastain Trail every day, as the standard is only that the use be substantial. The “ ‘thing of significance is that whoever wanted to use [the land] did so . . . when they wished to do so without asking permission and without protest from the land owners.’ ” (Gion v. City of Santa Cruz (1970) 2 Cal.3d 29, 40 [84 Cal.Rptr. 162, 465 P.2d 50], quoting Seaway Co. v. Attorney General (Tex.Civ.App. 1964) 375 S.W.2d 923, 936.) But the use here does not qualify as substantial. It necessarily follows from the legacy hikers’ experience of encountering “three to four” others on the trail that a reasonable owner on the trail would have a similar experience, and would be put on notice that the property was *1041 used only by a handful of persons on weekends, and perhaps also on summer weekdays. This use can be described only as casual, exactly the sort an owner would permit because it does no harm and to refuse would be churlish and unreasonable. Such limited use would not put the owner on notice that the land was in danger of public dedication. Plaintiffs therefore made no showing that contradicted the idea of license, and therefore failed to satisfy Gion.
I would also hold that as a matter of law use of the “Peak Trail” by minors neither demonstrated a reasonable belief by the public that it had a right to use the property nor put defendants on notice the property was subject to public dedication.
Public dedication requires that “the public demonstrate through its achons that its members believed that they had a right to use the property.” (County of Los Angeles v. Berk (1980) 26 Cal.3d 201, 216 [161 Cal.Rptr. 742, 605 P.2d 381].) The belief must be reasonable. {Ibid.) But minors generally have a limited understanding of the rights attendant to ownership of real property and restrictions on its use by non-owners, and are as like to believe they may enter any property at will. They are born trespassers, and it would be unreasonable for an adult to believe a minor’s entering onto private property reflects even the minor’s right to do so, much less a public right. Therefore, use of private property by children neither demonstrates the public’s reasonable belief that it has a right to use the property nor affords notice to the owner that the property is subject to dedication to the public.
Here, the only users of the Peak Trail for four of the five prescriphve years, 1967, 1968, 1969 and 1972, and the nonsummer months of 1970 and 1971, were Goller and his companions. Most of the time these users were minors. Goller went with his father when he was 10 years old and with his Cub Scout den—with an adult leader—when he was 11, but when he was 12, 13, 14, and perhaps 15, he visited the Peak Trail exclusively with his friends, who presumably were minors like him. Foran, another user in 1971, was also a minor. Neither testified to seeing anyone else specifically on the Peak Trail.
This use of the Peak Trail was insufficient to support a finding of public dedication.

 “[T]housands” of hikers over the prescriptive period is not necessarily substantial. Because the prescriptive period contained 1,827 days, “thousands” could mean as few as one to two users per day. We assume the trial court used the term in its nonspecific sense.

 I discount Saul’s experience as an outlier.